## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

BETH BROWN,

              Plaintiff,

     v.

THE MEADOWS at EAST MOUNTAIN-BARRE for NURSING and REAHABILITATION LLC,

              Defendant.

CIVIL ACTION NO. 3:22-CV-00828

(MEHALCHICK, J.)

## MEMORANDUM

Before the Court is a partial motion for summary judgment filed by Plaintiff Beth Brown ("Brown") and a motion for summary judgment filed by Defendant, The Meadows at East Mountain-Barre for Nursing and Rehabilitation LLC, ("Meadows"). (Doc. 20; Doc. 24). Brown initiated this action under the Fair Labor Standards Act of 1983 ("FLSA") and the Pennsylvania Minimum Wage Act ("PMWA"). (Doc. 1). For the reasons set forth herein, Brown's motion for partial summary judgment (Doc. 20) shall be **DENIED** and Meadows's motion for summary judgment (Doc. 24) shall be **DENIED**.

### 1. FACTUAL AND PROCEDURAL BACKGROUND[1]

### 2. FACTUAL BACKGROUND

The facts relevant to the instant motions are as follows.[2] Meadows is a rehabilitation center and skilled nursing facility. (Doc. 21, ¶ 1; Doc. 21-2, at 5; Doc. 26, ¶ 4). Brown worked

---

[1] Unless otherwise indicated, the facts provided below are taken from the parties' statements of material facts, responses thereto, and supporting exhibits. (Doc. 21; Doc. 26; Doc. 30; Doc. 31).

[2] Brown argues Meadows's Answer to her Statement of Undisputed Material Facts should be stricken because Meadows has denied the allegations set forth in Paragraphs 6

at Meadows as the Director of Housekeeping [3] from January 2017 to April 2022. (Doc. 21, ¶¶ 6, 8; Doc. 21-4, at 6; Doc. 26, ¶¶ 6, 8). She came into the position through a promotion from her previous role as a housekeeper. (Doc. 21, ¶¶ 5, 6; Doc. 26, ¶ 6; Doc. 26-2, at 15). Former Meadows's Administrator Gary Malia ("Administrator Malia") testified that he promoted Brown because "she knew the job very well," and so that he could "use her wherever I need her to make sure the daily assignments got completed in the building." (Doc. 26-4, at 18, 25). Through the promotion, Brown became entitled to comp time,[4] a budget, and a raise. (Doc. 21, ¶¶ 17, 26, 34; Doc. 26-2, at 26, 41). She also left her union and started participating in morning meetings with various department heads, as well as nurses and social workers. (Doc. 21, ¶¶ 11-12, 18; Doc. 21-4, at 8-9; Doc. 26, ¶¶ 12, 18, 20; Doc. 26-2, at 23, 34). During her time as Director of Housekeeping, Brown was responsible for scheduling, computer work,

---

through 8 and Paragraphs 13 through 109 without including citations to the record and therefore has violated Local Rule 56.1. (Doc. 31; Doc. 32, at 3). Local Rule 56.1 provides that a statement of material facts in support or opposition to a motion must include citations to the record. "In reviewing a motion for summary judgment, the court may consider any materials in the record but is not required to look beyond those materials cited by the parties. It is not the responsibility of the court to 'comb the record in search of disputed facts.'" *United States v. Dentsply Int'l, Inc.*, Civ. A. No. 12-07199, 2016 WL 1403991, at *1 (E.D. Pa. Apr. 11, 2016) (citing Fed. R. Civ. P. 56(c)(3) and quoting *N.J. Carpenters Pension Fund v. Hous. Auth. & Urban Redevelopment Agency*, 68 F. Supp. 3d 545, 549 (D.N.J. 2014)). Whereas the Court has conducted a thorough review of the record in this case, the Court will not "comb through the record in search of disputed facts" on behalf of Meadows. *Dentsply Int'l, Inc.*, 2016 WL 1403991, at *1. The Court will therefore rely only on cited assertions within the parties' statements of facts and answers thereto. The Court will decline, however, to strike Meadows's Answer to Brown's Statement of Undisputed Material Facts at this time. (Doc. 31).

[3] Brown's "Director of Housekeeping" position is also referred to as the "Environmental Services Manager" throughout the pleadings. (Doc. 21, ¶¶ 8, 81; Doc. 21-4, ¶ 6; Doc. 26, at 2 n.2).

[4] Comp time is explained to be compensated time a manager could take off in the event that it was necessary for the manager to work extra hours as part of their job duties. (Doc. 26, ¶ 34; Doc. 26-5, at 55).

placing orders, supervising[5] six housekeeping employees, and hiring.[6] (Doc. 21, ¶ 13; Doc. 21-5, at 7-8; Doc. 26, ¶ 16; Doc. 26-2, at 31, 35; Doc. 26-5, at 26-28; Doc. 30, ¶ 32). Additionally, Brown was expected to fill in when her staff needed help or called off from work. (Doc. 21, ¶ 27; Doc. 26, ¶ 24; Doc. 26-2, at 26; Doc. 26-4, at 24).

As Director of Housekeeping, Brown regularly worked more than forty hours per week. (Doc. 21, ¶ 9; Doc. 21-8). At no time was she paid overtime compensation. (Doc. 21, ¶ 10; Doc. 21-2, at 9; Doc. 21-4, at 14). This was because Meadows classified Brown as an exempt employee pursuant the overtime compensation provisions of the FLSA and PMWA. (Doc. 21, ¶ 4; Doc. 21-4, at 14; Doc. 31, ¶ 2; Doc. 26-5, at 26). Meadows classified Brown as exempt because they deemed her role to be "a management position and those positions are considered exempt." (Doc. 21, ¶ 106; Doc. 21-2, at 9, 11-12; Doc. 21-4, at 14; Doc. 26, ¶ 33). According to Meadows, as Director of Housekeeping, Brown was no longer expected to perform housekeeping and laundry tasks unless there was a deficiency with her staff.[7] (Doc. 26, ¶ 27; Doc. 26-4, at 24; Doc. 26-5, at 26-29). The record, however, reflects that as Director of Housekeeping, Brown still spent a large portion of her workday cleaning resident rooms, stocking shelves, vacuuming, emptying trash cans, folding and sorting laundry, operating washing machines, transporting linens, labeling resident's clothing, dusting, mopping, and

---

[5] While Brown does not dispute that she "supervised" employees, she clarifies that "it is denied that any testimony has been elicited or evidence otherwise introduced of what 'supervising' employees consists of." (Doc. 30, ¶ 13).

[6] Whereas Brown asserts she only ever hired one employee, Administrator Malia testified that Brown "would hire and fire." (Doc. 21-4, at 7; Doc. 26-2, at 63-64; Doc. 30, ¶ 32). Testimony from other Meadows Administrators and Brown support that, at the time of her termination, she did not have the authority to fire. (Doc. 21. ¶ 44; Doc. 26-5, at 34).

[7] Brown denies this statement. (Doc. 30, at 6-7).

even at times operating the floor scrubber. (Doc. 21, ¶¶ 18, 20, 31-40; Doc. 21-5, at 9-10; Doc. 21-10, at 8; Doc. 26-4, at 24; Doc. 30, ¶¶ 24, 27).

Brown was terminated from Meadows in April 2022 by Administrator Loree Levulis ("Administrator Levulis"). (Doc. 21, ¶¶ 101-102; Doc. 21-10, at 6; Doc. 26-5, at 64). Brown's termination write-up indicates she was terminated for "lack of communication," "improper use of authority," and insubordination. (Doc. 21, ¶¶ 101-102; Doc. 21-10, at 6; Doc. 26-5, at 64). Regarding Brown's lack of communication, Administrator Levulis testified:

> Lack of communication is [Brown] had never spoke to me and given me updates on things that she should have. Again, you know, [the employee who resigned] was one of them. . . . She never spoke to me about anything that was going on in her department. I had to find out through other people. In the past I had spoken to her about it and again nothing.

(Doc. 21, ¶102; Doc. 21-10, at 6).

At the time of her termination, Brown was paid the hourly equivalent of $18.58 per hour, based on a 40-hour workweek. (Doc. 21, ¶ 104; Doc. 21-14, at 2). The members of Meadows's housekeeping and laundry staff who, similar to Brown had been employed for between three years and six years, earned $12.50 per hour. (Doc. 21, ¶ 105; Doc. 21-15).

3. PROCEDURAL BACKGROUND

On May 25, 2022, Brown filed a complaint with this Court alleging Meadows violated the FSLA and PMWA by failing to pay Brown overtime compensation for the time she worked in excess of the 40 hours work week while she was Meadows's Director of Housekeeping. (Doc. 1, at 8-9). As relief, Brown seeks an award of unpaid compensation and liquidated damages. (Doc. 1, at 9).

On April 7, 2023, Brown and Meadows each filed a motion for summary judgment, a brief in support of their respective motions, a statement of facts, and accompanying exhibits.

(Doc. 20; Doc. 21; Doc. 22; Doc. 24; Doc. 25; Doc. 26). On April 28, 2023, Brown and Meadows each filed a brief in opposition to each other's motions and an answer to each other's statement of facts. (Doc. 28; Doc. 29; Doc. 30; Doc. 31). On May 12, 2023, the parties filed reply briefs. (Doc. 32; Doc. 33). The Court conducted oral argument concerning the pending motions for summary judgment on November 9, 2023. Accordingly, both motions for summary judgment are fully briefed and ripe for discussion. (Doc. 20; Doc. 24).

## 4. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the nonmovant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In

- 5 -

deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

"Although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact.'"[8] *Velentzas v. U.S.*, No. 4: CV-07-1255, 2010 WL 3896192, at *7 (M.D. Pa. August 31, 2010) (quoting *Goode v. Nash,* 241 F. App'x 868, 868 (3d Cir. 2007)) (citation omitted). The opposing party "cannot rest solely on assertions made in the pleadings, legal memorandum, or oral argument." *Goode,* 241 F. App'x at 868 (internal quotation marks omitted). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the nonmovant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

With respect to cross-motions for summary judgment, "[e]ach movant must demonstrate that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the court must deny [both] motions." *Quarles v. Palakovich*, 736 F. Supp. 2d 941, 946 (M.D. Pa. 2010) (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir.

---

[8] *See Beenick v. LeFebvre,* 684 F. App'x 200, 206 (3d Cir. 2017) (stating the purpose of requiring parties to cite particular parts of the record in their briefs about a motion for summary judgment is to "assist the court in locating materials buried in a voluminous record") (quoting Fed. R. Civ. P. 56(c)(1)(A)).

2008)). However, a federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell,* 206 F.3d at 278.

**5. DISCUSSION**

### A. MEADOWS'S CLASSIFICATION OF BROWN AS AN EXEMPT EMPLOYEE UNDER THE EXECUTIVE EXEMPTION

Through their respective motions, both Brown and Meadows request that this Court decide whether Brown is an "exempt employee" under the FLSA and PMWA's "executive exemption." [9] (Doc. 22, at 7; Doc. 25 at 3-4). If Brown does meet this definition, she will not be entitled to the overtime pay she has brought this action to collect. (Doc. 1, ¶¶ 39, 45; Doc. 25, at 4).

The FLSA was enacted to "protect covered workers from substandard wages and oppressive working hours." *Friedrich v. U.S. Computer Services.*, 974 F.2d 409, 412 (3d Cir. 1992). "The FLSA establishes federal minimum-wage, maximum-hour, and overtime

---

[9] For the purpose of this motion for summary judgment, the Court will use the FLSA's four factor test to review the parties' executive exemption claims pursued under both the FLSA and the PMWA because the laws are "essentially identical." *Szabo v. Muncy Industries, LLC,* No. 21-CV-468, 2023 WL 2472599, at n.55 (M.D. Pa. Mar. 10, 2023); *see Baum v. Astrazeneca LP,* 372 F. App'x 246, 248 (3d Cir. 2010) (analyzing a PMWA exemption argument under the FLSA test because "Pennsylvania courts have looked to federal law regarding the [FLSA] for guidance in applying the PMWA."). The only difference apparent to the Court between these statutes implicates the compensation factor. *See* 29 C.F.R. § 541.100(a)(1); 34 Pa. Code § 231.82(1)(4)(iv). Whereas the FLSA requires a showing that the employee makes at least $684 on a weekly basis, the PMWA requires a compensation "at a rate equal to the weighted average 10th percentile wages for Pennsylvania workers who work in exempt executive, administrative or professional classifications as determined by the Department with advice and consultation by the Minimum Wage Advisory Board[.]" 29 C.F.R. § 541.100; 34 Pa. Code § 231.82. As the parties have not disputed this factor in their briefing, the Court will decline to opine on whether this factor is satisfied at this time.

guarantees that cannot be modified by contract." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 69 (2013). Under the legislation, employers are required "to pay their employees at least a specified minimum hourly wage for work performed and to pay one and one-half times the employee's regular rate of pay for hours worked in excess of forty hours per week." *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 306 (3d Cir. 2003) (citing 29 U.S.C. §§ 206, 207). 29 U.S.C.A. § 207 sets forth the FLSA's overtime rules. Under 29 U.S.C.A. § 207, unless an exemption applies, an employer must pay any employee who works more than forty hours during a week at an increased rate.

At issue in this case is whether the executive exemption to 29 U.S.C.A. § 207 applies to Brown. (Doc. 22, at 12-13; Doc. 25, at 5). The executive exemption is defined and explained in the Department of Labor Regulations ("Regulations"). *See* 29 C.F.R. § 541.100. The Regulations set forth a qualitative, not quantitative, four factor test to determine whether an employee is exempt from the FLSA's overtime provision as a "bona fide executive." *Soehnle v. Hess Corp.*, 399 F. App'x 749, 751 (3d Cir. 2010). An employee is a "bona fide executive" under the Regulations if (1) the employee is compensated on a salary basis at a rate not less than $684 per week, (2) the employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof," (3) the employee "regularly directs the work of two or more other employees" and (4) the employee has authority to hire, fire, promote, advance, or "any other change of status of other employees[.]" *See* 29 C.F.R. § 541.100. According to the Regulations:

> "[M]anagement" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or

sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102

"Consideration of the [the executive exemption] factors is a highly fact-intensive inquiry, to be made on a case-by-case basis in light of the totality of the circumstances." *Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 523 (S.D.N.Y. 2013) (citation omitted). The employer has the burden to demonstrate "plainly and unmistakably" that an employee qualifies for the exemption. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir. 1991); *Barba v. New Century Chinese Buffet, Inc.,* No. 2:20-CV-01557, 2023 WL 6348825, at *4 (W.D. Pa. Sept. 29, 2023) ("The employer has the burden to demonstrate 'plainly and unmistakably' that an employee qualifies for the exemption.").

At issue in this case is factor two of the FLSA's executive exemption test, whether Brown's "primary duty was management."[10] *See* 29 C.F.R. § 541.100. In support of their

---

[10] At this juncture, the Court will decline to determine whether FLSA's factor one, whether the employee is compensated on a salary basis at a rate not less than $684 per week, and factor three, whether the employee "regularly directs the work of two or more other employees," are met, as the parties have not put these factors in dispute. 29 C.F.R. § 541.100(a)(b-c). In her brief in opposition to Meadows's motion for summary judgment, Brown argues there is a genuine issue of fact concerning factor four, whether Brown was permitted to hire, fire, and/or change the status of any Meadows's employees. (Doc. 29, at 23). Meadows does not specifically address this argument, however, states broadly that as Director of Housekeeping, Brown had the ability to hire and discipline her staff. (Doc. 28, at 9; Doc. 33, at 5). The record is unclear as to what degree of authority Brown had to hire, fire, promote, and demote employees under her supervision. *See* 29 C.F.R. § 541.100(a)(4).

classification of Brown, Meadows asserts that Brown was "considered [] to be an exempt employee because she held a management position. . . The testimony of record in this case, including that of Brown herself, establishes that Ms. Brown's duties as Director of Housekeeping were not just primarily managerial, they were almost all managerial in nature." (Doc. 25, at 5). Meadows's argument therefore hinges on factor two, the primary duty factor, being met. According to Brown, her primary duty was not management, but to perform the non-exempt duties necessary to the continuing operations of Defendant's facility. (Doc. 22, at 12-13). Accordingly, Brown asserts factor two is not met.

The record reflects that Brown performed exempt and non-exempt work while employed by Meadows. (Doc. 21-2, at 9, 12; Doc. 21-4, at 8, 9, 10; Doc. 21-5, at 9, 10, 11, 16; Doc. 21-9, at 8, 9). "Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption[.]" 29 C.F.R. § 541.106(a). The executive exemption may still apply so long as management is the employee's "primary duty." *See* 29 C.F.R. § 541.700. The Regulations define "primary duty" to be "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700. To determine an employee's primary duty, courts consider "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt

---

Testimony from Administrator Levulis supports that Brown was permitted to make hiring decisions, but that she did not have the authority to promote or fire her staff. (Doc. 21-2, at 9; Doc. 26-5, at 34). Brown argues she was ultimately issued a write-up for "improper use of authority" and "insubordination" in part for failing to inform her superiors that one of her housekeeping staff members had resigned and needed to be replaced. (Doc. 21, ¶¶ 100-01; Doc. 21-13, at 2; Doc. 32, at 6). Administrator Malia testified that Brown could both hire and fire. Doc. 26-2, at 63-64). Accordingly, because there is conflicting testimony on this matter, the record is unclear as to what degree of authority Brown had to hire and fire employees. The Court cannot make a determination as to factor four at this time.

work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." 29 C.F.R. § 541.700; *see Bradley v. S.C. Boys, Inc.*, No. 4:20-CV-00262, 2022 WL 3021140, at *9 (M.D. Pa. July 29, 2022).

Applying this analysis to the case at bar, the record is inconclusive as to whether Brown's primary duty was managerial. First, regarding the relative importance of Brown's exempt duties compared to her duties and the amount of time she spent performing exempt versus non-exempt work, the record fails to create a clear distinction between Brown's roles. While Meadows submits testimony evidence that Brown performed a number of exempt tasks identified in the Regulations and was not expected to work as a housekeeper,[11] Brown submits testimony evidence that she performed mainly non-exempt tasks for Meadows on a daily basis.[12] (Doc. 21-2, at 9, 12; Doc. 21-4, at 8, 9, 10; Doc. 21-5, at 9, 10, 11, 16; Doc. 21-9, at 8, 9; Doc. 26-2, at 35, 55-56; Doc. 26-4, at 23-24, 28, 31; Doc. 26-5, at 26-29); *see* 29 C.F.R. § 541.102. For example, Administrator Malia testified that after her promotion, Brown "wasn't on the floor working as a housekeeper anymore," but instead was expected to complete mainly managerial tasks unless she needed to fill in for one of her staff members. (Doc. 26-4, at 24). Administrator Levulis also testified that Brown's "primary job was to oversee the employees of both the housekeeping and laundry departments to ensure that the work was being completed and completed appropriately." (Doc. 26-5, at 26-27). Brown, on the other

---

[11] Including scheduling, computer work, hiring, placing orders, signing off on timesheets, and supervising six employees working under her.

[12] Including vacuuming, pulling garbage, doing laundry, dusting, mopping, stocking shelves, cleaning shower and resident rooms, moving linen carts, and labeling resident clothing.

- 11 -

hand, testified that she was expected to arrive at Meadows every morning at 4:30 AM to clean, pull garbage, run the vacuum, "do barrel runs," and do laundry, all before turning on her computer. (Doc. 26-2, at 35). Also, that she spent only a negligible time on exempt tasks such as scheduling, for which she simply copy and pasted the same schedule each month, and meeting with the other department heads, which she did for just fifteen minutes each morning.[13] (Doc. 26-2, at 34, 35, 54). Considering this conflicting testimony, Meadows's relatively small housekeeping and laundry staff, and the frequency in which Brown testified she was required to complete non-exempt tasks to ensure the running of the facility, the Court cannot discern the relative importance of all Brown's exempt and non-exempt tasks in relation to each other or the amount of time she spent on each. (Doc. 21-2, at 9; Doc. 21-4, at 8, 9, 10; Doc. 21-5, at 9, 10, 11, 16; Doc. 21-9, at 8,9).

Next, considering Brown's relative freedom from direct supervision, the record again provides contradiction. Whereas Meadows argues Brown had "autonomy over her department," the record reflects that she was subject to sizeable oversight. (Doc. 21-4, at 8; Doc. 21-10, at 5, 7; Doc. 26-4, at 18, 33). According to Administrator Malia, Brown was promoted so that he could "use her wherever I needed her to make sure the daily assignments got completed." (Doc. 21-4, at 8; Doc. 26-4, at 18). While Brown was Director of Housekeeping, Administrators would "do rounds" to check on her work and would subject her to daily meetings filled with feedback to "help [Brown] see what she was missing or needed to focus on better." (Doc. 21-10, at 5, 7; Doc. 26-4, at 33). Brown was ultimately

---

[13] In her testimony, Brown even suggests that she did not have time to confer with Administrators because she was too busy, stating "I don't have time to chit chat with everybody. I have rooms to do. I have laundry to do. I have garbage to pull out. I don't have time to chit chat with them." (Doc. 26-2, at 55-56).

disciplined for "lack of communication," and "improper use of authority" because, in Administrator Levulis's words, Brown failed to "give [the Administrator] updates on things she should have," including an employee resignation and a bleach odor in the laundry room. (Doc. 21, ¶ 102; Doc. 21-10, at 6; Doc. 26-2, at 42). Thus, despite testimony from Meadows employees that Brown ran her department, reasonable minds could disagree about the amount of freedom Brown had from supervision. (Doc. 21-4, at 8; Doc. 21-10, at 5-7; Doc. 26-2, at 42; Doc. 26-4, at 18, 34.).

Lastly, when reviewing the relationship between Brown's salary and the wages paid to other housekeeping and laundry staff for the same kind of non-exempt work performed by Brown, again the record is unclear. The record provides at the time of her termination, Brown was paid the hourly equivalent of $18.58 an hour based on the forty-hour work week. (Doc. 21, ¶ 104; Doc. 21-21-14).  Meanwhile, her housekeeping and laundry staff was making an average of $12.50. (Doc. 21, ¶ 105; Doc. 21-15). Brown asserts that because she worked more than 40 hours per week, her effective hourly rate was actually much lower than $18.58, fluctuating between $14.86 per hour and $12.39 per hour, depending on the number of hours worked per week. (Doc. 22, at 23). Again, given this fluctuation, this factor is inconclusive. *Cf. Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1257-58 (11th Cir. 2008) (calculating the difference between the pay rates of exempt and non-exempt employees based on the hours actually worked by the employee, not their salary based on a forty-hour work week when considering the primary duty factor of an executive exemption claim under the FLSA).

Considering the analysis *supra*, there remains a question of material fact regarding whether Brown's primary duty was managerial. Accordingly, as all the executive exemption factors must be met for the exemption to apply, summary judgment on this basis for both

Meadows's and Brown's motions is **DENIED**.[14] (Doc. 20; Doc. 24); *see Barba v. New Century Chinese Buffet, Inc.*, No. 2:20-CV-01557, 2023 WL 6348825, at *5 (W.D. Pa. Sept. 29, 2023) (denying summary judgment where the Court was "not convinced that a reasonable jury would be compelled to conclude as a matter of law, based on this record, that the Plaintiffs did not qualify for the executive exemption" because the employees' primary duty analysis was inconclusive); *see also Plaunt v. Dolgencorp, Inc.*, No. 1:09CV084, 2010 WL 5158620, at *13 (M.D. Pa. Dec. 14, 2010) (denying summary judgment where there was an issue of material fact as to whether the employee's primary duty was management); *see also Capaldo v. Remington Long Island Emps.*, No. 18CV2746LDHAYS, 2023 WL 2710251, at *19-20 (E.D.N.Y. Mar. 30, 2023), *appeal withdrawn sub-nom. Borrero v. Remington Hotels*, No. 23-762, 2023 WL 4850518 (2d Cir. May 25, 2023) (denying summary judgment on the issue of whether executive exemption applied where plaintiff asserted that his "chief executive" title was a misnomer, his primary duties involved manual labor, not management, his hiring and firing recommendations were not given any particular weight, and he disputed the amount of authority defendants maintain he held).

## B.  Liquidated Damages under the FLSA

In addition to recovery for compensation for unpaid wages, Brown requests liquidated damages. (Doc. 1, ¶ 39). Brown argues that she is entitled to liquidated damages because

---

[14] As an alternative defense, Meadows appears to allege Brown may be considered exempt as an administrator under both the FLSA and PMWA. (Doc. 25, at 9). Brown argues Meadows waived this defense as, throughout discovery, Meadows represented to Brown that they were only seeking relief under the theory of executive exemption. (Doc. 29, at 24-26). Accordingly, Brown was unable to conduct any discovery regarding the applicability of the administrative defense. (Doc. 29, at 25). Because the Court is denying summary judgment at this time, the Court will decline to review Meadows's argument that the administrative exemption should apply on the merits. (Doc. 31, at 6-7).

Meadows "took no steps to determine whether [her] exempt classification was warranted[.]" (Doc. 22, at 7). Meadows does not respond to this argument in any of their filings. Brown thus further asserts that because Meadows has failed to respond to her argument, her claim should be deemed unopposed, thus entitling her to liquidated damages. (Doc. 32, at 8).

Under 29 U.S.C. § 216(b), an "employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." The "liquidated damages" provision is not penal in its nature but constitutes compensation for the retention of an employee's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (1945). Courts are permitted to deny liquidated damages when an employer demonstrates good faith and reasonable grounds for believing their actions did not constitute an FLSA violation. 29 U.S.C. § 260. To show good faith, the defendant employer must show that he took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions. *Souryavong v. Lackawanna Cnty.*, F. Supp. 3d 514, 519 (M.D. Pa. 2016) (quoting *Martin*, 940 F.2d at 907 (internal quotations and emphasis omitted)).

Having determined there remains a genuine dispute of material fact with respect to whether Brown was correctly classified as exempt under the FLSA, the Court declines to address whether Brown is entitled to liquidated damages in violation of the FLSA. *See Clark v. Delaware Valley Sch.*, 450 F. Supp. 3d 551, 568 (M.D. Pa. 2020) ("Having determined immediately above that there remains a genuine dispute of material fact with respect to whether the plaintiffs were correctly classified as exempt employees under the FLSA, we find

- 15 -

that a decision on these remaining issues would be merely advisory, and thus we will deny the plaintiff's motion on these issues."); *see also Lin v. One Coco Nails & Spa Inc.*, No. 3:20-CV-01509, 2022 WL 3723981, at *13 n.35 (M.D. Pa. Aug. 29, 2022) ("As the Court finds that Plaintiff [] is not entitled to summary judgment for her claims under the FLSA, the Court declines to address whether she is entitled to liquidated damages . . . .").

Accordingly, Brown's partial motion for summary judgment on this basis shall be **DENIED.**

6. C**ONCLUSION**

For the reasons set forth herein, both motions for summary judgment are **DENIED**. (Doc. 20; 24). An appropriate Order follows.


Dated: May 1, 2024                    *s/ Karoline Mehalchick*
                                      **KAROLINE MEHALCHICK**
                                      **United States District Judge**